Counsel. Good morning, judges. Thank you so much. This is Alessandra de Blasio, hearing on behalf of Mr. Mugiraneza, who is the appellant in this case. The question before the court is whether a reasonable adjudicator would be compelled to conclude that, indeed, Mr. Mugiraneza carried his burden of proof that it is more likely than not that if he's removed to the Democratic Republic of Congo, he would be in danger of being subjected to torture. I just would like to point out a few things. The first one, which maybe got lost in my briefs, in my filing, but Mr. Mugiraneza is not the ordinary person who seeks a deferral of removal under the Convention Against Torture, under the CAT. He's a refugee, and he's not an ordinary refugee, he's from the DRC, the Democratic Republic of Congo. And among the hundreds of pages of the Immigration Court documents, it notes that in 2016, this is the first time that we've had refugees from the DRC than any other country. And at the end of 2016 is exactly when Mr. Mugiraneza applied for deferral. And so I think the point is, it's almost what I would analogize as a presumption case. It starts on different footing from everybody else who applies for the CAT. And so we, this country, accepted him as a refugee because we already recognize or acknowledge that he's somebody who cannot, is unable to return home. And indeed, he spent 20 years outside of the country in a refugee camp because he can't go home. So I think in terms of finding whether he's reached his burden, I think the most compelling point of the case, for me anyway, is among us, who would want to be, would wear his shoes and arrive at the airport in the Congo, and not be afraid that they would be taken off and possibly killed, tortured. And I think the standard is quite low, it's 51 to 49%. And he faces a two-sorted condition, which I repeated throughout the brief, and I'll stop here. But he is both a Tutsi, ethnic Tutsi, and then he's somebody who will be returning as a refugee. And I think that- Can I ask you, excuse me, can I ask you about that second point? How would people in the DRC know that he was a, as you described, a failed asylum seeker, as opposed to simply someone who was being deported from the United States? Because that I understand, right? He would have travel papers that were obtained from the DRC, so there's got to be some communication with the country, presumably, or maybe not. But why would they know that he had sought and failed to receive asylum? How is that something that they would know? I think they would know without knowing exactly what immigration services and secret services in different countries do, but they must have documentation that he was out of their country and in Rwanda for 20 years. So they would not have had any tracking of him. And also, I think- I'm sorry, is that in the record? That this is something the DRC knows? I mean, considering the country seems to be in a shambles, I don't know why we would make factual assumptions about the quality of their record keeping or their intelligence. So I guess what's in the record that would suggest, because again, our question is, would a reasonable adjudicator be compelled to reach the conclusion you want? So you have to base your arguments on something in the record. So perhaps, is there something in the certified administrative record that would help me on that? I think that, first of all, to be compelled when we're talking about a standard of 51 to 49. So I think it would be a- I don't think compelled is 100% compelled or 75% compelled. It's 100% compelled to believe it's 51% likely, right? So whatever. Just point me to something in the record that supports your argument that the DRC would know that he is- that he was a failed asylum seeker. What in the record? Can you give us a page citation? Well, I can say that from pages 700 to 730, this is the document docketed at 31-2. So it's where all of his documents are. Those are the pages that show that he was accepted here as a refugee. So that will have some documentation. But those are the documents in the possession of the United States, right? Yes. And we don't send asylum paperwork overseas. So the question is, what part of the record supports your argument that the DRC would know that he was a failed asylum seeker? Not that the CIS knows. But what about the DRC? I think that the information, the way we know is that he will be arriving from the United States. So he will be an asylum seeker. Asylum means he has, in their context and in the context of the documents which talk about asylum seekers, is he is somebody who has left their country voluntarily as a Tutsi to get away from the country. And anybody who's returning in those circumstances as a Tutsi was an asylum seeker. So that is your, and there's no evidence in the record, but you are suggesting that it is a compulsory inference that we should draw, or that the BIA or the IJ should have drawn, that the DRC will consider any Tutsi returning to DRC, they will view them as a failed asylum seeker. Yes, and in the manner that he's being returned. So he's not walking over the border on his own. He's being returned, and the government will know it. He's being returned by the United States. They will know it as a Tutsi return. Counsel, this is Judge Kuhler. Yes. Isn't there some oral testimony of knowledge of other people who returned and how they were met by the DRC at the airport? Isn't that in the record? I believe it is, Your Honor, that he testified about relatives who had gone back, a cousin who had gone back with others. They were all killed. He escaped, the cousin escaped again. So I would say, yes, Your Honor. So can I just ask you on that point to follow up on Judge Kuhler's question, was that part of their testimony that they were met at the airport or detained, or are you mixing the people who returned and were killed with some of the documentary evidence that some people who returned were detained at the airport? Or was there, in fact, testimony to the effect that you just described to Judge Kuhler? And what pages? I would defer to Judge Kuhler's reading where she found that there was such testimony. But you're correct, Your Honor, that what I was saying was, I was specifically what I remember, and it's quite a bit of testimony, and I should know it all. But what I remember specifically was the cousin talking about crossing the border, and that was not returning at an airport. And that's what I was referring to as well. Judge Rosny? I was going to say, may I ask you, if we were to clear the hurdle of whether or not there's some evidence supporting this, and focus on the evidence you did offer that this is the experience of others, I gather your strongest evidence is the article that says that Congolese authorities view seeking asylum as an act of treason, and that almost every returned person monitored in 2011 was imprisoned, tortured, forced to pay a ransom, raped, or subjected to sexual harassment, right? Yes, Your Honor. Okay. Now, I have two questions respecting that evidence. The first is, some of the things in the list of conduct that has been experienced would qualify as torture, and some would not, is that right? Yes. Okay. Because your client has been denied asylum and withholding, largely based on his assaultive conduct, it's only the likelihood of torture that would secure him release under the cap, right? Yes. Okay. So, is your view that the agency was compelled by evidence dating from 2011, some of which reflected torture and some of which did not, to find that he would likely face torture? I just want to be sure I understand if that's basically the evidentiary support. I think that the agency, again, compelled, I don't think they're compelled, but maybe I'm not using that word well, but they should have, by 51%, have found that, yes, based on the 2011 report, but also there's the 2016 report, which- Saying what? Which two? Oh, I'm sorry. That was the report about the Tootsies, so that wasn't the- Saying, oh, yes, the Tootsie report. Well, you see, my concern here is, if I understood what the IJ and BIA did, they didn't think the evidence about him being a Tootsie was persuasive because they thought that circumstances had sufficiently changed not to think that it was likely he would be tortured on that basis. As far as him being a returned refugee, I didn't see that that was argued in front of the IJ, but the BIA alluded to this evidence and characterized the whole as mistreatment. But what I'm concerned about is, if we were to remand for him to consider, well, some of it was torture, what's your argument going to be? Well, some of it is torture and some of it is not, therefore, assume that he would be tortured and draw an assumption that what he would face in 2020 is what people faced in 2011? Is that basically what you've got? Yes, what I have is that, for him, it's exponential. So it's not just that he's coming back as the returned or failed asylum seeker, which puts the country on notice as he arrives. He also... But I'm concerned about the staleness of this evidence in compelling a finding that it was more likely than not that he would be tortured in 2020. I mean, this dates from 2011, and it talks about some people being tortured. That's... We have to assume that the report is using that word as our law uses that word. Rape, which I think has been recognized as torture. The other actions, though despicable, would not qualify as torture. How do you get to this evidence being enough to compel a conclusion that he likely faced torture in 2020? I think part of that is that, as I mentioned, it's the difficulty of getting contemporaneous reports. But he filed this in January of 2017. So it was... Well, it's still six years. Yes, so I would ask on remand that we have the opportunity to submit additional contemporaneous evidence, and then it could be... Why should that be allowed if you didn't have anything contemporaneous to 2016? I mean, I understand if I were saying to you, oh, your 2016 evidence is now stale, but you didn't have contemporaneous evidence at the time this was heard, and that you say there was error committed. I think it wasn't contemporaneous, and with... Contemporaneous, I think, has to go back at least a couple of years. Can't get a report which shows years' worth of behavior on the day that you're filing. But yes, I think your honor's correct, that it was a few years back. But given the circumstances that he's been in for four years, and that at the time, the IJ said circumstances had changed in... Counsel, this is Judge Fuller. Didn't the BIA acknowledge a February 2017 forced migration review article about the risk to return to asylum seekers in the DRC? Didn't they? Did the BIA do that? Yes, your honor. Thank you. Yes, your honor. The BIA did not reject that as stale. It just didn't find it persuasive because it diminished the, I think, import of the... Right. They called it mistreatment, but that was evidence in the record, and it wasn't stale at the time he submitted it. Isn't that correct? That is absolutely correct, your honor. What does the 2017 report say with respect to torture? I'm not sure... Because I started by asking you whether your strongest evidence was the forced migration review report that talked about the monitoring in 2011. So I'm just trying to make sure I look at whatever it is in 2017 and what it says about torture. You're reminding me of something that you did say before about the circumstances changing. I do think that torture is also a very strong argument because part of why the judges... Again, I thought... Just stick with me for a moment. What is the 2017 report that you're now relying on or want us to rely on? And what does it say about torture? Okay. There was a UK... I'm just quickly looking through. Here we go. The British Home Office survey? Yes. Yes. But that talked about people being questioned by the National Intelligence Agency in Kinshasa, right? Am I on the right report? I'm just looking here. I have a... That's in... Okay. Just tell me what your 2017 report is that I should be sure to look at. There's the... See, that's the Forced Migration Review article. It's February 2017. And it's pages 595 to 600 of the record. Well, that's the Forced Migration Review. That's alluding to the 2011 monitoring. That's the article about February 2017. Right. The article is 2017, but it reports on what happened to asylum seekers monitored in 2011. Am I right or am I missing something? Please help me. Yes. The FMR talks about people who were in 2011. So the report is more recent, but it refers to what happened in 2011. Okay. Just so it's clear, 2017 is an article and it is now reporting on what happened in 2011. Is that correct? That article was 2013, reporting on what happened in 2011. I thought that the Forced Migration Review article was February 2017. Is there another something that you're looking at? Forced Migration Review. I don't see the date in front of me right now. Okay. We'll try and go through it all. Thank you. I'm sorry. Is that Judge Fuller? Well, I was going to tell Ms. de Blasio that her time had expired. Could I ask one more thing? Yes. Thank you. I just want to go back to page 595 of the record, again, to this Justice First line about almost every returned asylum seeker monitored in 2011. For one thing, the Forced Migration Review, as I read this, simply has a one sentence or two sentence summary of various reports. Is that a fair description of what this document is? Yes. So, the actual report from Justice First was not submitted as part of the administrative record, correct? Correct. So, does the record reflect when they say almost every returned asylum seeker, does it reflect whether they're talking about hundreds of people, dozens of people, or fewer? It does not reflect that. Have you actually looked at it? I mean, there's a hyperlink. I mean, have you actually read this article from Justice First? No. I mean, it's not in the record. But would it be surprising if they were to learn that the report talked about a number of people who were actually monitored between 2006 and 2011, and on average talked about some total of either three or four people a year on average? No, and it's outside the record. And no, I would not be surprised. I agree with Your Honor. I would not be surprised. There are other... It seems to me that how can we fault the BIA for saying that this one line is insufficient to demonstrate whether or not the petitioner would more likely than not be subject to torture upon his return if we have no information in the record, and it was his burden to submit it, of how many people were talking about over what period of time, and how many fell into the category of torture as opposed to, say, brief imprisonment. I guess that's my puzzlement. If we have no information about what on earth the actual findings of this article were, how extensive they were, what they talked about, I don't see how he's met his burden. And he was represented by counsel. Yes. And I think when we're going by, when the organization says that almost everybody, 100% of 500% of 1,000 people. It's not how many people upon return are tortured, it's that almost every one of those people is tortured. So if only five return and four people are tortured, that's significant because he'll be number six, for example, who's returned. And so the likelihood of his being tortured is not based on the number of people who were, but the percentage of those. So I think it is a powerful document, and I think it was diminished. Counsel, this is Judge Fuller. Wasn't the problem with the BIA's decision that they mischaracterized what happened to the failed asylum seekers as mistreatment rather than torture? Yes. Wasn't that? Okay. That's the problem, and that's why this court cannot rely on the findings or consider all of the evidence. And so it can't be that their decision was based on substantial evidence or otherwise. Thank you, counsel. You've reserved two minutes for rebuttal. We'll hear from the government. Thank you so much. May it please the court. Breanne Whalen-Cohen on behalf of the United States Attorney General. The court should deny the petition for review examining the limited question of record compels reversal of the agency's conclusion that petitioner failed to show more likely than not that he would be tortured in the DRC. I'm going to transfer to the argument about failed asylum seekers, and I'd like to start by giving some more information to Judge Nardini's question about how the DRC government would know that the petitioner was an asylum seeker. And I would just point out that there is no record evidence to show that. And second, the matter of regulatory protection, that there are confidentiality provisions for the United States with regard to people who have sought asylum in the United States. I would also point out that. Do you have a practical question on that? Yes. He's going to need a passport to get back, isn't he? I mean, he's been out of the country for, what is it, close to 20 years? That's correct. And so he's going to need a new Congo passport. And you don't think they're going to ask him how he's been out of the country? He does need a new travel document. And that is something that DHS works with the return country in all asylum cases. And again, DHS is prevented from relaying that information. Of course, it is possible that the returning country would ask a returnee whether or not they sought asylum. Or draw an inference from the fact that DHS is seeking help for him, no? As opposed to him just acting on his own? They could draw an interest. But I would say that that would be a speculative claim because there are returnees who have never sought asylum who are just being removed simply because they are an overstay or they are a criminal alien who has not applied for any relief or a returnee who failed on an adjustment of status application. So I would say that that would only provide a speculative basis for his claim as a returnee. I would also point out that the country conditions show that I'll refer to, I believe it's the forced migration report that failed applications, they may be questioned. Or excuse me, they are often systematically summoned to the migration office, but they are only sometimes questioned. So again, his claim would have to rely on a series of speculative conditions to occur. And that is insufficient under the demanding standard that is required for cap protection. I also wanted to address just briefly the testimony, the witness testimony about returned asylum seekers and clarify that the record does have testimony from his witnesses, but much of that testimony relates to people that fled the Rwandan refugee camps and returned to DRC in the late 1990s. There was also one witness who testified, but even that testimony, I believe, dated to 10 years before his hearing for the immigration judge. So again, these are based on conditions that existed at the time that he was a refugee status. I'm sorry, just pause on the testimony. I thought one of his relatives testified that he knew of someone who was a family member and therefore Tutsi who had returned only a year prior to the testimony and was killed. And do you recall that testimony? And am I getting that date wrong? I thought there was at least one person. I'm sorry. Yes, there was. When I was referring to the 1990s and the 2011, that was with regard to returned asylum seekers from the refugee camp, he did testify or there was a witness, I believe, that testified. And actually, I'm sorry, Petitioner also testified that he had learned via Facebook that in 2017, there was an attack that, according to his sources, was against Tutsis. And I believe he testified that his uncle was present for the attack and then returned back to the Rwandan refugee camp. There was no further corroboration of that testimony. And when he was asked how he learned about it, he heard that he had heard it from people through Facebook. Now, there was no adverse credibility finding, right? No, there was not. Do we take his testimony? Considering there was no adverse credibility finding, was the BIA then obliged, as we are, to assume that we should be crediting what the witnesses all said? Yes, we should credit it as true on its face. But of course, there's a different question with regard to whether or not it sufficiently meets the burden. And on this case, I would argue that because he doesn't have much to show why the people were attacked, who the attackers were, whether or not the government was involved, all of these questions would be relevant to whether or not he could ultimately succeed in a CAT claim. So without those details and without that corroboration, it is one isolated incident without sufficient support as compared to the wealth of information in the State Department country reports that do not reflect that Tutsis are targeted. Can I just ask you? I mean, very specifically, I'm looking at page 561 of the record, and I can't remember Mr. Ruchiera or Mr. Bimana. I don't know. Is this the brother-in-law? Yes, I believe that's his brother-in-law. And he testified about a killing of, I think it's seven people and injuring of 15. And I thought he was saying that they were Tutsis and that they were killed by Interhame, who I understand is a Hutu group. And that was in 2017. And I may have those facts wrong, but am I reading that the right way? I'm actually pulling up the paper right now so I can double check that. I do not recall that the uncle, like I said, he had said that he also heard about this attack where there were seven injured and 15 dead. And that just seemed very fresh in 2017. I can't remember, they were debating whether it was October or March of 2017. And I thought he very specifically said that they were killed by Interhame. Yes, I'm reading the testimony now. And yes, and I think that the agency did take that at face value, just like they took at face value that there is ongoing ethnic conflict in DRC, that there are isolated incidents of violence, and in some areas, widespread incidents of violence. But just to continue on the topic. I'm sorry? Counsel, this is Judge Kuhler. Doesn't this petitioner suffer additionally because he comes from North Kivu, which has specific geographic problems with the government? Yes, the petitioner is from North Kivu. And the country reports do talk about conflict in North Kivu and South Kivu. But what they represent is that actually at this time, the government has been working to combat rebel militia groups who are actually aligned with the Hutus, and that more prevalent in the country reports are incidents of attacks against Hutu individuals. What is noticeably absent is that the government is in any way targeting Hutus. So again, while there is ongoing conflict, and the agency recognized that, it's insufficient to show that it's more than likely than not that this particular petitioner would be targeted for harm. And that is what is required to succeed under a cap protection claim. The petitioner argues that this is a cumulative claim, both that he was a returned speaker of benefits from this government, as well as being a Tutsi. And that though each claim may separately not be enough to get him withdraw together, the two claims do. Can you speak to that? Yes, Your Honor. Certainly, the agency is required to consider all of the harm alleged by an applicant for cap protection. However, it is on the applicant to show that each step is more than likely than not to occur. So when you're talking about aggregating harm, you would have to show that each of those things make him likely for target. So in this case, he would have to show that the government is interested in him because he is a returned asylum seeker, and that if they are interested in him, they would subject him to mistreatment that rises to the level of torture. If the Tutsi ethnicity would factor into that, then that would be a part of that. But in this situation, he keeps them rather separate. So he's claiming that either he will be subject to violence from the government because he's Tutsi or because he's an asylum seeker. And he failed on either one of those to show that burden. Or he makes an a-for-siori argument that each of these characterizations, each of these features of his complaint make the other one worse. That's right. But he would have to prove each one was likely to occur. I understand he would have to prove each one. But together, he argues it makes it makes him a larger target. In any event, in conclusion, Ms. Cohn? Thank you, Your Honor. We ask that you deny the petition for review because petitioner has not met the required standard for cap protection. Thank you, counsel. Ms. de Blasio, you've retained two minutes for rebuttal. Ms. de Blasio? Sorry. I was talking to myself there on mute, saying how kind you were to give me an extra minute since the first part was so long. I just wanted to say that with the forced migration review, this goes to Judge Nardini, which was 2017. There was reference to the Justice First, which was 2011. But the article also referred to 2015, the situation of what France had talked about, 590 Congolese returning. Then there was the UK report, which was from 2014. And then with the country report— But what do those reports say about torture? If the British report is the Home Office study, is that what you're talking about? That one talked about questioning, which wouldn't rise to torture. I just want you to tell us with these other reports that have dates after 2011, how they support a claim of torture. I understand that they're dated later. Yes. So how does the France—and I'm not sure what the France one that you're referring to is. I know there was discussion of France, but what in particular in there? It's that page— Supports the torture. It's that page 8 of my brief. And so it's the 2015 France deported 590 Congolese, and it says that they were treated—almost every returned asylum seeker was treated as an act of treason. Wait a minute. Wait a minute. You're mixing two things. These have two separate sentences, two separate footnotes. The France is cited to a French report saying they returned 590 people. The second sentence refers to the Justice First report regarding 2011. There is nothing in the report that says that Justice First was studying the French people. Right. You're mixing and matching two different reports. Justice First was not studying the French. The forced migration review is the one that had both. And the forced migration review has two sentences. The first sentence regards that there was a France deported 590 Congolese citizens whose application for asylum had failed, period. And there's a footnote. There is nothing in here that says what, if anything, befell those Congolese citizens from France, correct? Yes. So how does that help you? If there is zero information about anything bad or good befalling these people, how is that even a useful piece of information? Yes. I don't have, because of the phone situation, I'm not in front of the computer, so I can't see that. I just have my brief in front of me, unfortunately. And it says here, however, maybe to me it looks like claiming asylum in another country may be treated as an act of treason. And then separately, almost every returned asylum seeker. It's not separate. That's a single following sentence that's all linked to the Justice First report with a separate footnote. So I don't think you can jerry-rig the Justice First report into also supporting the notion that the Congolese from France are also mistreated. So I think you're kind of double something up there. All right. Well, the final thing I just wanted to say was that the country reports, the immigration court said that the country reports didn't show that the Tutsis, there was still an ongoing genocide. And I think that they did not read the country reports understanding, just because they didn't say Hutu and Tutsi, all of the organizations or many of the fighting that they were talking about was actually against Tutsis. So our country reports were not specific, but that doesn't mean that it wasn't the Tutsis who were actually the focus of the violence by the government or government-supported organization. I thank you very much. Thank you. Thank you, counsel. Thank you. I will reserve the session.